# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CIVIL ACTION NO. 05-30005** |
| **VERSUS** | * | **JUDGE JAMES** |
| **JUAN FRANCISCO VAZQUEZ URIBE** | * | **MAGISTRATE JUDGE HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a Motion to Suppress filed by the defendant, Juan Francisco Vazquez Uribe ("Uribe") (Document No. 25). For reasons stated below, it is recommended that the motion be **DENIED.**

The evidence presented at a hearing held on Tuesday, August 23, 2005, demonstrated as follows. In the early morning of December 15, 2004, Sergeant Shannon Harkins ("Harkins"), a deputy with the Ouachita Parish Sheriff's Office, stopped the vehicle in which Uribe was a passenger as it traveled eastbound on Interstate 20, near the Highway 165 exit. Immediately prior to initiating the stop, Harkins had recorded the vehicle traveling 66 m.p.h. in an area with a posted speed limit of 60 m.p.h. Harkins exited his police cruiser, approached the passenger side of Uribe's vehicle, and asked the driver, Elizabeth Nevarez ("Nevarez"), for her driver's license. Nevarez, who responded that her driver's license was in her purse in the trunk, exited the vehicle and produced a California driver's license. Harkins testified that as Nevarez exited and attempted to find her driver's license he observed that "[h]er hands were just shaky shaky." Harkins then inquired about Nevarez's itinerary, and she stated that she was returning from a three day stay in Dallas, but she could not remember where or with whom she had stayed.

Harkins then turned to Uribe. After determining that Uribe could not speak English, Harkins asked Uribe, in Spanish, for his identification, vehicle registration, and insurance information. Uribe

complied, and the registration identified Uribe as the vehicle's owner. Uribe also displayed "unusual nervous shaking of the hands" when he handed Harkins his license and registration. As with Nevarez, Harkins inquired with Uribe about where he was traveling. Uribe stated that he and Nevarez were coming from California. After receiving the vehicle information and driver's licenses of both individuals, Harkins returned to his vehicle to begin writing a citation and to conduct a criminal history check. Harkins learned while writing the citation that Nevarez had previously been deported and was now an illegal alien.

While awaiting a response to the criminal history query,[1] Harkins returned to Nevarez and explained why she was receiving a citation. During this time, Nevarez continued to clutch a "coin pouch," which prompted Harkins to ask if there were any weapons or contraband in it. Nevarez stated, "No," and as she handed the coin pouch to Harkins, added, "You're more than welcome to look." Upon inspection of the coin pouch, Harkins found a gas receipt dated two to three days prior from a California gas station. After being informed of the conflict between with her alleged three day stay in Dallas and the information contained in the gas receipt, Nevarez stated that she and Uribe had only been in Dallas for three hours. With his suspicions aroused, Harkins proceeded to ask Nevarez sequential questions about whether the car contained any contraband. Nevarez affirmatively denied the existence of weapons and marijuana; however, when asked about cocaine, she "looked back towards the rear bumper and there was a slight pause. She hung her head and she said, "No."" At this point, Harkins ended the inquiry and asked both Nevarez and Uribe if they would consent to a search of the vehicle; both of them verbally agreed.

With the help of Deputy Ryan Baker ("Baker"), who observed but did not participate in the

---

[1] Harkins did not receive a complete response to the criminal history query until after the events in question. While he had issued Nevarez a citation, he retained her and Uribe's licenses.

earlier questioning, Harkins noticed a false compartment in the vehicle's undercarriage.  From inside the vehicle, Harkins and Baker removed the carpet covering the compartment and noticed, through a hole roughly an inch thick, packages wrapped in packing tape.  At this point, Baker advised Harkins that, during the earlier questioning, Uribe had covered the compartment's interior access point with a blanket.  Using a drill from his police cruiser, Harkins obtained a sample of one of the packages' contents, and it tested positive as methamphetamines.  A subsequent full search of the vehicle revealed over 17 kilograms of cocaine and over 3 kilograms of methamphetamines.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The reasonableness of traffic stop searches and seizures under the Fourth Amendment is analyzed in accordance with the framework set forth by the Supreme Court in *Terry v. Ohio*. 392 U.S. 1 (1968).  Under *Terry*, the analysis is two-tiered: (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the seizure of the vehicle was reasonably related in scope to the circumstances that justified the stop. *Id.* at 19-20; *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001).

In *Whren v. United States*, the Supreme Court unanimously upheld a traffic stop in which an officer observed a defendant commit a traffic violation. 517 U.S. 806, 116 S.Ct. 1769 (1996). In accordance with its long line of cases, the Supreme Court held that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 1772.  The Supreme Court flatly rejected an invitation by the defendant to look to the subjective motivation of the police officer at the time of the stop.  In *Whren*, the court found the stop reasonable under the Fourth Amendment because the officers had probable cause to believe that petitioners had violated the traffic code.  The officer had observed the violation firsthand. *Id.* at

3

1777; *see also United States v. Harrison*, 918 F.2d 469 (5th Cir. 1990).

Uribe's claim that the initial stop of his vehicle violated his Fourth Amendment rights is without merit. Pursuant to *Terry* and *Whren*, stopping a vehicle for a traffic violation is justified so long as probable cause exists. *See Whren*, 116 S. Ct. at 1772; *Terry*, 392 U.S. 19-20. Harkins testified that he directly observed Uribe's vehicle traveling at 66 m.p.h. in a 60 m.p.h. zone, in direct violation of the Louisiana traffic code. *See* La. Rev. Stat. Ann. § 32:61 (2005). Uribe has provided no controverting evidence on this fact; therefore, Harkins had sufficient probable cause and was wholly justified in stopping the vehicle.

Uribe's second assertion that the search of his vehicle was unreasonable according to *Terry* is also without merit. The Fifth Circuit recently decided a case with facts quite similar to this one. *United States v. Brigham*, 382 F.3d 500 (5th Cir. 2004). In *United States v. Brigham*, the defendant was stopped for following another vehicle too closely. *Id.* at 504. The defendant and his passengers gave inconsistent accounts of their travel plans and displayed signs of extreme nervousness. *Id.* at 504-05. After verifying the legality of the defendant's information but still waiting on the background check of a passenger, the officer returned the defendant's driver's license, provided a written warning for following too closely, and asked the defendant for his consent to search the vehicle. *Id.* The defendant gave consent, and a subsequent search revealed drugs in the vehicle. *Id.* at 505.

The *Brigham* court rejected the contention that all questioning must end when the officer is prepared to issue a citation or warning, emphasizing that the court must examine the totality of the circumstances to determine if the given detention is reasonable. *Id.* at 507. In finding that the questioning and detention was reasonable, the court noted that the officer's suspicion was properly grounded in the following facts: (1) the defendant was not the owner or lessee of the vehicle; (2)

the owner or lessee was not present in the vehicle; and (3) the driver's and passengers' versions of their itinerary conflicted. *Id.* at 508. The court also noted that, although the officer had issued the defendant a warning, he obtained the defendant's consent while he was still waiting on a background check of a passenger. *Id.* at 510.

In this case, as in *Brigham*, Harkins was justified in questioning Nevarez and Uribe further about the origin of their trip and the contents of their vehicle, despite having already issued Nevarez a traffic citation. Indeed, prior to this questioning Harkins had already received conflicting accounts from Uribe and Nevarez about where they were coming from and how long they had stayed there. Both individuals had also displayed nervous habits earlier in the stop. Nevarez's voluntary offering of the coin pouch only raised Harkins's suspicions further when he discovered a gas receipt that directly contradicted her earlier statements. Finally, Nevarez's curious response to Harkins' question regarding cocaine justifiably compelled him to stop the questioning and obtain consent to search the vehicle. There is no evidence that either Nevarez's or Uribe's consent was involuntary or non-consensual. Perhaps most significant though, as in *Brigham*, is that during these events Harkins was still waiting for a criminal history check on both Uribe and Nevarez. The initial stop had not ceased at this point, and Harkins' questioning "exemplified a graduated response to emerging facts." *Brigham,* 382 F.3d at 509.

Because the underlying stop was justified at it inception, because of the totality of the circumstances that emerged thereafter, and because both individuals gave consent to search the vehicle, the undersigned finds that the stop and search were reasonable and recommends that the motion to suppress be **DENIED**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written

5

objections with the Clerk of Court.  A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 1st day of September 2005.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE